Curt W. Clausen (No. 019709)
**CLAUSEN LAW, PLLC**
4500 S. Lakeshore Drive, Ste. 300
Tempe, AZ 85282
Telephone: (602) 285-4476
Facsimile:  (602) 285-4448
Firm Docketing E-mail: firm@clausenlawaz.com
*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| LISA ELOWSON, an individual, | NO. _____ |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| ALPHATEC SPINE, INC., a California Corporation; JOHN DOES I-X; JANE DOES I-X; BLACK CORPORATIONS I-X; WHITE PARTNERSHIPS I-X, | **(Tort – Product Liability)** |
| | (Jury Trial Requested) |
| Defendants. | |

COMES NOW Plaintiff Lisa Elowson and files this Complaint against Defendant Alphatec Spine, Inc., and in support hereof shows unto the Court the following:

### PARTIES, VENUE, AND JURISDICTION

1. Plaintiff is currently a resident of Vermont and voluntarily submits to the jurisdiction of and venue in this Court.

2. Defendant Alphatec Spine, Inc. is a California corporation authorized to transact business in Arizona and may be served with Summons and a copy of this Complaint by delivering the same to its registered agent, C T Corporation System, at 3800 North Central Avenue, Suite 460, Phoenix, Arizona 85012.

3. At all times relevant hereto, Alphatec has and continues to regularly conduct business in the State of Arizona.

4. At all times relevant hereto, Alphatec was engaged in the business of, *inter alia*, designing, engineering, manufacturing, constructing, testing, inspecting, assembling, packaging, labeling, marketing, distributing, selling and otherwise placing into the stream of commerce spinal implant devices, including the Arsenal Spinal Fixation System and component parts that were implanted into Plaintiff's spine which failed and formed the basis of this action.

5. Defendants John Does I-X, Janes Does I-X, Black Corporations I-X and White Partnerships I-X are corporations, business entities, persons, or agents whose true identities are presently unknown to Plaintiff. Plaintiff alleges that John Does I-X, Jane Does I-X, Black Corporations I-X and White Partnerships I-X is in some manner responsible for the acts and occurrences as outlined below. When Plaintiff learns of their actions, failures and/or omissions, Plaintiff may seek leave of the Court to amend the Complaint to set forth their true identities.

**Jurisdiction and Venue**

6. On July 9, 2019, Plaintiff underwent a spinal fixation procedure at Barrow Neurological Brain and Spine in Phoenix, Arizona, wherein the doctors used the Arsenal Spinal Fixation System manufactured by Defendant Alphatec.

7. The Parties are diverse and the amount in controversy exceeds $75,000.

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

9. Venue is appropriate as the incident giving rise to Plaintiff's claims occurred in Maricopa County, Arizona.

**FACTUAL AVERMENTS**

10. Defendant Alphatec designs, develops, manufactures, and markets products for the surgical treatment of spine disorders. Alphatec markets and sells these products throughout the United States, including within the State of Arizona. The products designed, developed, manufactured, marketed, and sold by Alphatec include, among others, spinal fixation systems that consist of pedicle screws and connecting rods.

11. Spinal fusion, generally, is a surgical technique used to stabilize the vertebrae and the disc between the vertebrae. The goal of spinal fusion is to create solid bone between two or more vertebrae to reduce pain from motion and nerve root inflammation. Once the disc has been removed between the vertebrae, a spinal fusion is performed. This procedure allows the surgeon to fill the space left by replacing the disc with an interbody device. The interbody device is then packed with bone growth promoting allograft, thereby facilitating two or more vertebrae to grow together, or fuse. During the procedure, bone graft and interbody spacers are used to stabilize the anterior column. The posterior column is then locked in place with the pedicle screws, connecting rods, and additional bone graft.

12. Many different types of metal implants are used during spinal fixation surgeries to hold the vertebrae in position while the fusion heals. Bone heals best when it is held still, without motion between the pieces trying to heal together. The healing of a fusion is no different than healing a fractured bone, such as a broken arm.

13. Pedicle screws and connecting rods are used during a lumbar spinal fusion to add extra support and strength to the fusion while it heals by locking the spine in place. The pedicle screws are implanted in the vertebrae above and below the fusion area. Connecting rods are inserted through the pedicles of the screws and locked in place. Once secured, the connecting rods

prevent movement which promotes the healing process. During the postoperative recovery period, it is critical that the screws remain intact and not break.

14. On April 27, 2019, Plaintiff slipped and fell while shopping for groceries.

15. Plaintiff was 49 years old and in good health at the time of her fall.

16. Approximately one week after Plaintiff fell, she reported pain in her lower back.

17. Plaintiff's primary care physician order an MRI on or about the week of April 26, 2019.

18. Thereafter, a second MRI with contrast was scheduled by the radiologist.

19. Plaintiff was then sent on an emergency basis to Barrow Neurological Brain and Spine, where it was determined that a surgical procedure was necessary to remove a non-malignant tumor from her spine.

20. On June 12, 2019, Plaintiff underwent a multi-planar CT scan of her lumbar spine.

21. During the CT scan, a meningioma tumor spanning from Plaintiff's L2 through L5 vertebrae was detected.

22. On July 9, 2019, Plaintiff underwent a complex surgery involving multiple procedures.

23. First, a spinal fixation procedure was performed to stabilize Plaintiff's spine. The Arsenal Spinal Fixation System manufactured by Defendant Alphatec was used for this procedure. Defendant's pedicle screws were implanted on the right side at the L2, L3, L4, and L5 levels and on the left side at the L2 and L5 levels. The screws were then connected by inserting rods through the pedicles of the screws. The rods were then locked in place with cap screws.



24. Second, the spinal canal was enlarged by performing laminectomies at the L2, L3, L4, and L5 levels.

25. Third, facetectomies were performed whereby approximately 2 centimeters of the left inferior facets of the L3 and L4 vertebrae and the superior facets of the L3, L4, and L5 vertebrae were removed.

26. Finally, the tumor was exposed and removed.

27. In November 2021, Plaintiff relocated to Vermont from Arizona.

28. In April 2024, Plaintiff began experiencing severe back pain in her lumbar region. At that time, prior to undergoing any treatment, an x-ray of Plaintiff's spine was ordered. The x-

ray revealed that the Alphatec Arsenal pedicle screw implanted in Plaintiff's L4 vertebrae had broken prior to fusion.

29. On April 24, 2024, an MRI of Plaintiff's lumbar spine further confirmed that the Alphatec Arsenal pedicle screw implanted in the posterior side of Plaintiff's L4 vertebrae had broken. This is when Plaintiff discovered the failure of one or more of the Alphatec screws that had been implanted into her spine.

30. Section 510(k) of the Food, Drug and Cosmetic Act requires device manufacturers to notify the FDA of their intent to market a medical device at least ninety (90) days in advance. This allows the FDA to classify the device and determine whether it is substantially equivalent to another device already on the market.

31. The Alphatec spinal screws at issue in this case are Class II medical devices.

32. As a Class II medical device, all that Alphatec was required to do prior to marketing these screws was submit a 510(k) premarket notification to the FDA.

33. The 510(k) process imposes a limited form of review on manufacturers intending to market a new device, including Class I and Class II devices, by only requiring the submission of a premarket notification to the FDA.

34. Because the 510(k) process is not focused on safety, the approval requirements do not impose device-specific requirements for purposes of the Medical Device Amendments of 1976 ("MDA"). Thus, the state law claims raised herein below are not preempted by the MDA's express preemption clause.

. . .

. . .

. . .

## COUNT I
## DEFECTIVE PRODUCT - DESIGN DEFECT

35. Plaintiff incorporates Paragraphs 1 through 34 herein as if set forth and restated herein.

36. Alphatec designed, engineered, manufactured, distributed, marketed, and/or sold the Alphatec Arsenal Spinal Fixation System and associated pedicle screws implanted in Plaintiff.

37. As the manufacturer of goods or products for the use of others, Alphatec is liable in tort, irrespective of privity to Plaintiff as a natural person who used, consumed, or was reasonably affected by the property; and who suffered injury to her person and/or property because the property when sold by Alphatec was not merchantable and/or reasonably suited to the use intended, and its condition when sold is the proximate cause of the injuries sustained by Plaintiff.

38. The Alphatec Arsenal Spinal Fixation System and associated pedicle screws implanted in Plaintiff were in fact defectively designed, developed, engineered, and/or manufactured and were not merchantable or reasonably suited for their intended use at the time said screws were sold by Alphatec.

39. The Alphatec Arsenal Spinal Fixation System and associated pedicle screws implanted in Plaintiff, as designed, developed, engineered, manufactured, distributed, marketed, and sold by Alphatec, were not merchantable or reasonably suited for their intended use at the time said screws were sold. Specifically, the Alphatec Arsenal Spinal Fixation System and associated pedicle bone screws used in Plaintiff's lumbar spine failed to perform as intended and designed by breaking before fusion could occur in Plaintiff's lumbar spine. Because said failure occurred prior to the fusion healing fully, the screws were incapable of serving their intended purpose of providing the necessary stability to the vertebral column during this critical period of recovery.

40. As a direct and proximate result of the failure of the Alphatec Arsenal Spinal Fixation System and associated pedicle screws implanted in Plaintiff, Plaintiff has suffered, and continues to suffer, serious and permanent bodily injury, pain and suffering, disability and impairment, disfigurement, loss of capacity to enjoy life, expensive hospitalization, medical and nursing care and treatment, medical expenses, loss of wages and earning capacity, and fear and mental anguish for which Alphatec is strictly liable. Specifically, Plaintiff suffered, and continues to suffer, debilitating pain as a result of (a) the breakage itself; (b) a recommendation to undergo a second spinal surgery to (i) remove and (ii) replace the Alphatec screws and (iii) implant titanium interbody devices between Plaintiff's vertebrae; (c) the inability to fully remove a broken Alphatec screw from her vertebrae; and (d) having to undergo a second recovery period following the second spinal surgery. These injuries are either permanent or continuing in nature and will continue to be suffered by Plaintiff for the rest of her life.

## COUNT II
### NEGLIGENCE *PER SE*

41. Plaintiff incorporates Paragraphs 1 through 34 herein as if set forth and restated herein.

42. 21 C.F.R. § 820.1(a)(1) "govern[s] methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use" and "establishes basic requirements applicable to manufacturers of finished medical devices."

43. Moreover, these regulations apply "to any finished device … intended for human use, that is manufactured, imported, or offered for import in any State or Territory of the United

States…."[1] Because the State of Arizona is within the United States, there is no question that 21 C.F.R. part 820 applies to the Alphatec screws at issue here.

44. Pursuant to 21 C.F.R. § 820.3(e), "*Design history file* (*DHF*)" is defined as "a compilation of records which describes the design history of a finished device."

45. "*Design review*" is defined as "a documented, comprehensive, systematic examination of a design to evaluate the adequacy of the design requirements, to evaluate the capability of the design to meet these requirements, and to identify problems."

46. *Establish* means "define, document (in writing or electronically), and implement."[2]

47. "*Manufacturer*" is defined as "any person who designs, manufactures, fabricates, assembles, or processes a finished device" and "includes but is not limited to those who perform the functions of … relabeling, remanufacturing, repacking, or specification development, and ***initial distributors of foreign entities performing these functions***."[3]

48. As the "initial distributor" of the subject devices, Alphatec is a "manufacturer" under federal law.[4] Alphatec must, therefore, "establish and maintain procedures to control the design of the" subject devices "in order to ensure that specified design requirements are met."[5]

49. Alphatec's design review obligations also require that it "establish and maintain procedures to ensure that formal documented reviews of the design results" for the subject devices "are planned and conducted at appropriate stages of the device's design development."[6]

---

[1] 21 C.F.R. § 820.1(a)(2) (emphasis added).
[2] 21 C.F.R. § 820.3(k).
[3] 21 C.F.R. § 820.3(o) (emphasis added).
[4] 21 C.F.R. § 820.3(o).
[5] 21 C.F.R. § 820.30(a).
[6] 21 C.F.R. § 820.30(e).

50. These "procedures" must "ensure that participants at each design review include representatives of all functions concerned with the design stage being reviewed and an individual(s) who does not have direct responsibility for the design stage being reviewed, as well as any specialists needed."[7]

51. Moreover, "[t]he results of a design review, including identification of the design, the date, and the individual(s) performing the review, shall be documented in the design history file (the DHF)."[8]

52. Alphatec's status as the "manufacturer" of the subject devices also requires that it "establish and maintain procedures" for verifying and validating the design of the subject devices.[9] "The results of" both the "design validation" and "design verification," "including identification of the design, method(s), the date, and the individual(s) performing the verification" and "validation" of the subject devices must "be documented in the DHF" by Alphatec.[10] Federal law also requires Alphatec "establish and maintain a DHF for each" of the subject devices must "be documented in the DHF" by Alphatec. Federal law also requires Alphatec "establish and maintain a DHF for each" of the subject devices.[11]

53. Lastly, Alphatec's DHF for each of the subject devices must "contain or reference the records necessary to demonstrate that the design was developed in accordance with the approved design plan and the requirements of" 21 C.F.R. part 820.[12]

---

[7] *Id*.
[8] *Id.*
[9] 21 C.F.R. § 820.30(f)-(g).
[10] *Id.*
[11] 21 C.F.R. § 820.30(j).
[12] *Id.*

54. The foregoing federal regulations impose multiple duties on Alphatec to review, validate, and otherwise ensure that the design of the bone screws it distributes to hospitals in the United States are reasonable and safe for their intended use.

55. The Alphatec lumbar pedicle spinal screws implanted into Plaintiff contain an outdated and defective European style of design in which there is a "sharp edge" between the thread pattern and the minor diameter of the screw shaft.

56. The "sharp edge" makes the screws prone to fractures at the joint between the thread and screw.

57. Spinal screws manufactured in the United States generally employ a smooth radius and transition between the screw thread and minor diameter to eliminate this sharp edge and provide for a smooth transition to reduce the potential for crack initiation and propagation.

58. Alphatec breached its duties to review, validate, and otherwise ensure that the design of the bone screws it distributes to hospitals in the United States are reasonably safe for their intended use.

59. Had Alphatec performed its duties imposed by federal law, it would not have sold the Arsenal Spinal Fixation System without altering the screw thread design to contain a more suitable smooth radius and transition between the thread and screw.

60. The failure of Alphatec to perform any meaningful review or validation of the bone screws was the proximate cause of the implantation of defective screws into Plaintiff.

61. As a direct and proximate result of the failure of Alphatec to review or otherwise validate the design of the lumbar pedicle screws implanted in Plaintiff, Plaintiff has suffered, and continues to suffer, serious and permanent bodily injury, pain and suffering, disability and impairment, disfigurement, loss of capacity to enjoy life, expensive hospitalization, medical and

nursing care and treatment, medical expenses, loss of wages and earning capacity, and fear and mental anguish for which Alphatec is liable. These injuries are either permanent or continuing in nature and will continue to be suffered by Plaintiff for the rest of her life.

## COUNT III
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE

62. Plaintiff incorporates Paragraphs 1 through 34 herein as if set forth and restated herein.

63. When Defendant Alphatec sold the Arsenal Spinal Fixation System and its component parts, placing it into the stream of commerce, it was not fit for its ordinary purpose and should not have been considered merchantable.

64. The Arsenal Spinal Fixation System and its component parts were being used for their ordinary and regular purpose at the time of the failure.

65. As a direct and proximate result of the Arsenal Spinal Fixation System and its component parts, being unfit for its ordinary purpose, Plaintiff has sustained personal injuries and damages.

66. Defendant Alphatec violated the customary and usual procedures, standards, and safeguards, which existed as all times relevant to said Arsenal Spinal Fixation System and its component parts, as recognized by persons possessing the same or similar expertise as Defendant Alphatec.

67. As a direct and proximate result of the breach of the implied warranty of merchantability and fitness for a particular purpose by Defendant Alphatec, Plaintiff sustained personal injuries and damages.

# Jury Trial

68. Plaintiff requests a jury trial.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Lisa Elowson prays for judgment against Defendant: Alphatec Spine, Inc. as follows:

(a) For general damages in an amount to be proven at trial, including but not limited to pain, suffering, anxiety, embarrassment, disfigurement and disability;

(b) For past and future medical expenses incurred by Plaintiff;

(c) For all reasonable and necessary fees and expenses incurred as a result of having to file this lawsuit; and

(d) Any such other and further relief deemed just and proper by the Court.

**DATED:** February 18, 2025.

**CLAUSEN LAW, PLLC**

/s/Curt W. Clausen
Curt Clausen
*Counsel for Plaintiff*